UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DANIEL QUICK                                                                                             PLAINTIFF

VS.                                              Civil No. 2:14-cv-02087

CAROLYN W. COLVIN                                                                                    DEFENDANT
Commissioner of Social Security Administration

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Daniel Quick, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §423(d)(1)(A), 1382c(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. §405(g).

### I.      Procedural Background:

Plaintiff filed his application for DIB and SSI on May 18, 2012, due to depression, restless leg syndrome, high blood pressure, breathing problems and back problems. (T. 190) Plaintiff's application was denied initially and on reconsideration. (T. 58, 61, 67, 70).  Plaintiff then requested an administration hearing, which was held in front of Administrative Law Judge ("ALJ"), Ronald L. Burton on June 26, 2013.

At the time of the hearing, Plaintiff was 38 years of age and had completed the 8th grade. (T. 191)  His past relevant work ("PRW") experience included working as a glass cutter from 2003-2006, temporary laborer from February 2003 to May 2012, construction worker in 2007, retail

stocker from August 2007 to July 2008 and a sandwich maker from February 2010 to May 2010. (T. 191) Plaintiff stopped working on May 9, 2012, due to his conditions. (T. 190)

In a Decision issued on January 10, 2014, the ALJ found Plaintiff's lower back pain was severe, however it improved with medication. (T. 11) The ALJ determined the Plaintiff could perform a full range of light work as defined in 20 C.F.R. §404.1567(b). (T. 11) The ALJ compared the Plaintiff's residual functional capacity ("RFC") with the physical and mental demands of his previous work as a retail stocker and found the demands of the Plaintiff's PRW did not exceed his RFC. (T. 17)

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on February 7, 2014. (T. 1-3) Plaintiff then filed this action on April 10, 2014. (Doc. 1) This matter is before the undersigned for Report and Recommendation. Both parties have filed appeal briefs, and the case is ready for decision. (Doc. 9 and 11)

## II.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart,* 292 F.3d. 576, 583 (8th Cir. 2002). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue,* 495 F.3d 617, 617 (8th Cir. 2007). The AJL's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d, 964, 966 (8th Cir. 2003). The Court considers the evidence that "supports as well as detracts from the Commissioner's decision, and we will not reverse simply because some evidence may support the

opposite conclusion." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008). If after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young* at 1068.

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairments, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

If such an impairment exists, the ALJ must determine whether the claimant has demonstrated that he is unable to perform either his past relevant work, or any other work that exists in significant numbers in the national economy. (20 C.F.R. §416.945). The Commissioner's regulations require application of a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her

3

residual functional capacity. *See McCoy v. Schweiker,* 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §404.150, 416.920 (2003).

### III.   Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff had not been disabled from the alleged date of onset on May 9, 2012.  Plaintiff raises four issues on appeal, which can be summarized as: (A) the ALJ did not fully and fairly develop the record; (B) the ALJ erred in assessing the Plaintiff's credibility; (C) the ALJ erred as to the Plaintiff's RFC assessment; and, (D) the ALJ erred as to the Step 4 analysis finding Plaintiff could perform PRW. (Doc. 9, pp. 8-16) Because of the Court's ruling set forth below on the first point, the remaining points are not addressed herein.

**Development of the Record:**

The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made).  The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ is only required to develop a reasonably complete record. *See Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994).

The ALJ found the Plaintiff not disabled. (T. 17) The ALJ further found, based upon his RFC, that he could perform a full range light work and his PRW as a retail stocker. (T. 16) The medical evidence of record, taken as a whole, does not substantially support that finding.

4

The medical evidence is as follows.

Plaintiff was treated at Summit Medical Center (Summit) from 2004 to April 4, 2009. While being treated at Summit, Plaintiff complained of breathing problems and back pain. Plaintiff had an MRI of his lumbar spine December 14, 2004, which showed mild annular L-4-5 and L5-S1 level with mild bilateral neural foraminal narrowing at L5-S1 level primarily due to a mild bulging annulus. (T. 335) On August 27, 2005, Plaintiff was treated by Dr. Joni Carmack for tenderness and spasms of the lower back. (T. 334) Dr. Carmack prescribed Valium and restricted Plaintiff to not lift more than ten pounds until cleared by his primary care physician.

Plaintiff also saw Dr. Steve Nelson at Summit on August 27, 2005, after he had injured his back lifting a box of groceries. A computerized axial tomography ("CAT") scan of the lumbar spine showed mild annular disc bulges at the L4 and L5 levels with no focal disc herniation or significant spondylosis appreciated. (T. 324) Dr. Nelson assessed Plaintiff with a lumbar strain and prescribed Norflex. (T. 323)

On April 19, 2006, Plaintiff went to Summit complaining of freezing, fever, chronic back pain, and his pain medication had been stolen. The nurse observed Plaintiff complaining of being hot and he wanted his shirt off. Plaintiff sat up without assistance or grimaces. The nurse told the Plaintiff "it did not seem to bother your back too bad, sitting up like that." The Plaintiff responded, it "hurt real bad" then began moaning and flopped back on the stretcher. (T. 316) Plaintiff went to the emergency room at Summit on January 7, 2007, complaining of cough pains. Dr. Brent Chavis prescribed him Albuterol and Aerovent. (T. 277-279)

Plaintiff moved from Arkansas to Montana and established a doctor patient relationship with Dr. Edwin Medina, at the Phillips County Family Health Clinic, on May 12, 2011. Plaintiff complained of lower back pain. Dr. Medina observed the Plaintiff had a positive bilateral leg raise,

more prominent in the left than the right. He assessed him with chronic lower back pain, GERD, and arterial hypertension. (T. 402). Plaintiff entered into a pain contract with Dr. Medina. Dr. Medina advised the Plaintiff needed to meet with a surgeon to assess whether nor not his back could be fixed by surgery. Dr. Medina renewed his Lorcet and informed him to fill out the paperwork for the patient assistance program for Nexium and Lyrica. (T. 401)

On June 13, 2011, Plaintiff met with Dr. Medina to refill Lorcet. While conducting an examination, he observed Plaintiff's left leg raise was tender to movement and he could not move his left leg more than a few degrees without hurting his back. Dr. Medina received Plaintiff's medical records from Dr. Barker. (The Court was unable to locate any medical records for Plaintiff from Dr. Barker.) In reviewing the records, Dr. Medina was not impressed with Dr. Barker's last impression of his office visit and with the MRI. Dr. Medina assessed him with chronic lower back pain, ordered an MRI, and prescribed Ibuprofen and Lortab for the pain. (T. 400-401)

The MRI performed on July 7, 2011, showed bilateral neuroforaminal narrowing at L5-S1 and overt compression of the exiting left nerve root at L5. There was possible compression of the nerve root on the right. (T. 388-389) Dr. Medina noted Plaintiff had a "legitimate reason to complain of pain." (T. 399) Dr. Medina's recommendation was for the Plaintiff to be evaluated by a neurosurgeon to see if his back could be fixed. Plaintiff asked Dr. Medina "how we going to pay for this?" Dr. Medina's response was he did not know, but some institutions allowed payment plans. (T. 399)

On August 5, 2011, Plaintiff met with Dr. Medina and complained he was not doing well on Lortab. Plaintiff asked if there were any alternatives to the Lortab. Dr. Medina conducted a physical exam, which revealed a positive leg raise, more prominent on the left than on the right. He prescribed Methadone, added Hydrocodone for five days, and continued Ibuprofen. (T. 398)

On September 7, 2011, Plaintiff saw Physician's Assistant (PA) Randal Pearson at the Billings Clinic, Department of Neurosurgery. Plaintiff described pain in his lower left back region and pain more in his left leg. The leg pain radiated from the buttock primarily to the hamstring and down the back of the leg to the calf and angle. He described the pain as a throbbing or aching sensation in to the left leg greater than the right. Over the past couple of years Plaintiff noticed his legs have weakened, his left leg had given out and he had fallen three or four times. PA Pearson reviewed the MRI, which showed some evidence of degenerative disk at the L5-S1 level along with bilateral foraminal narrowing more to the left side than the right side. There was also evidence of significant compression of the exiting left L5 nerve root with impingement to a lesser extent along the right L5 nerve root. (T. 380-381)

PA Pearson reviewed Plaintiff's symptoms and noted, he was a long time smoker with chronic obstructive pulmonary disease ("COPD") and emphysema. He had some mild hypertension and reflux, had been diagnosed with restless leg syndrome and used Lyrica. He reported no anxiety or depression symptoms. PA Pearson conducted a musculoskeletal/neurologic examination of Plaintiff, which showed Plaintiff's primary area of sensitivity was in the low back off to the left posterior superior iliac spine ("PSIS") area. His forward trunk flexion was about 40 degrees before he had a pulling sensation in his left leg, which ran from the buttock down the back of the leg to his calf. A lower extremity motor exam showed a straight leg raise on the right side to -5 degrees before he had discomfort radiating into the right leg and buttock area. The left straight leg raise showed a -10 to 20 degrees short of full extension before the pain radiated from the left buttock all the way down the back of his leg to the ankle. Plaintiff further exhibited slight weakness of the left hip flexor compared to the right, and PA Pearson determined some of it may be due to pain as opposed to weakness. Plaintiff's hip abduction was slightly diminished on the left side. A lower

extremity sensory exam showed a decreased sensation about the left lateral and medial foot area as well as the medial and lateral lower leg and medial thigh on the left side only. Plaintiff's gait was slow with a noticeable limp on the left leg, and he was unable to perform a toe or heel raise on the left leg due to discomfort. (T. 381-382)

PA Pearson gave Plaintiff the option to try oral steroids or epidural steroid injections (ESI), to reduce some of the discomfort. Plaintiff stated he did not like needles, but understood the ESI would concentrate the steroids in the spot that needed to be treated. PA Pearson informed Plaintiff that both options were usually temporary and he may need to consider surgical treatment in the future. (T. 382-383)

Plaintiff reported to both Dr. Medina and PA Pearson that he went to the have the ESI, but the doctor turned him away due to his long history using pain medication. Dr. Medina did not know where the Plaintiff got that information and informed the Plaintiff it meant he was more a surgical candidate. (T. 395)

On January 12, 2012, Plaintiff complained his back hurt more than normal. An X-ray showed no evidence of disc disease and no evidence of neural foraminal encroachment. Dr. Medina thought it was a muscle spasm from twisting wrong. Plaintiff reported he was out of pain medication, Dr. Medina informed him he was under contract, he cannot self-medicate and if he was one day before the next month he would be off the contract. Dr. Medina informed Plaintiff to not sleep on the couch, as it would make it worse, instead sleep on the floor. (T. 389-390)

Plaintiff followed up with PA Pearson on February 15, 2012 and reported since his last visit he had more right leg symptoms than left leg. The pain was in the right leg and ran down the back of his leg to the lateral calf and across the anterior shin. On the left leg, it seemed to go down his hamstring and down the back of his calf to the ankle. He continued to have tingling and numbness

in both feet. Plaintiff attempted physical therapy, however after one visit he observed an increase in back and leg pain. While conducting an examination, PA Pearson observed diffuse pain in the lumbar spine with palpation. The lower extremity exam showed the left leg to be about 5 to 10 degrees short of full extension, with discomfort into the hamstring and calf area. With regard to hip flexion, Plaintiff noted increased discomfort across his lower back with both the right and left active hip flexion. He had difficulty holding up to resisted testing of his extensor hallucs longus ("EHL") on both sides. PA Pearson noted the EHL on both sides was not evident on his last exam. The lower extremity sensory exam showed decreased sensation across the right leg and foot. This was a noticeable change from his last visit, when he only showed mild changes in sensation to the left leg. He gait was slow, but generally normal. He was unable to walk on his toes, but could walk on heels without significant discomfort. PA Pearson observed new changes to Plaintiff's symptoms since the last visit. He recommended a new MRI and schedule an ESI. (T. 376-377)

Plaintiff moved from Montana back to Arkansas and established care with Dr. Puen in Hot Springs, Arkansas on April 18, 2012. Dr. Puen examined Plaintiff and observed pain in muscles or joints in the musculoskeletal examination and normal curvature in his back with tenderness. He diagnosed Plaintiff with tobacco use disorder, benign essential hypertension, reflux esophagitis and a body mass index (BMI) of 30.08. Dr. Puen needed verification of medication and diagnosis and the signed pain contract. He prescribed Nexium and Hydrochlorothiazide. (T. 411) On April 24, 2012, Plaintiff had a positive straight leg test, Dr. Puen informed Plaintiff he could not prescribe Methadone, but could prescribe oxycodone. Dr. Puen diagnosed Plaintiff with tobacco use disorder, lumbago and sciatica.

Throughout the doctor's visits with Dr. Puen from May 22, 2012 to August 2, 2013, Dr. Puen diagnosed Plaintiff with lumbago, tobacco use disorder, other specified idiopathic peripheral

9

neuropathy, body mass index, encounter therapeutic drug monitoring, and reflux esophagitis. Dr. Puen prescribed Plaintiff Oxycodone, Nexium, Hydrochlorothiazide, Lyrica, Albuterol Sulfate, and Trazadone Hydrochloride. Dr. Puen advised Plaintiff to lose weight and to stop smoking during his course of treatment. Plaintiff advised Dr. Puen his left leg kept giving out on him and he had fallen. (T. 472)

By April 4, 2013, Plaintiff continued to complain of lumbar tenderness with numbness to his left leg. Dr. Puen observed Plaintiff ambulated with a cane and he had no money for surgery. (T. 489) While Dr. Puen notes in his records, "failed back surgery," the Court could not locate any records Plaintiff's back surgery. (T. 487) Plaintiff continued to have severe back and right leg pain, throughout his course of treatment with Dr. Puen. (T. 485, 484, 483)

In reviewing the record, the undersigned observed Plaintiff was treated with pain relievers for a substantial period of time. A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations. *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003). In his Decision, the ALJ found Plaintiff's degrees of pain were substantiated by the record, however his degree of pain relief seeking behavior and treatment were not indicative of a degree of pain that would limit activities beyond his RFC. (T. 15) The ALJ further stated the Plaintiff had been prescribed and taken appropriate medications for the alleged impairments. (T. 15) On April 17, 2005 the ER doctor at Summit diagnosed Plaintiff with low back pain and prescribed Hydrocodone. (T. 366-372) On April 19, 2006, this was the same visit with the plaintiff flopping onto the stretcher, Plaintiff indicated he had his prescription for Lorcet refilled the week prior and it was stolen. (T. 298, 313) Plaintiff was given Toradol, Tylenol, Morphine and Phenergan while at the hospital. (T. 299, 300, 315) Upon discharge, the doctor prescribed Batrim, but no pain medication. (T. 299, 317-318) On Thursday January 12, 2012, Plaintiff sought treatment from Dr.

Median and informed him he had run out of pain medication, even though they were to be prescribed on Monday. (T. 390) Plaintiff indicated he took more because he was in a lot of pain. Dr. Medina told him to "not ever do that again or he is fired from his contract. His contract clearly states do not adjust your medications without consulting your provider. Self-medicating is unacceptable." (T. 390) Dr. Medina did prescribe his pain medication, however it was only three days early.

It is well-established in the Eighth Circuit that "drug-seeking" behavior may be used to discredit a claimant's subjective allegations of disabling pain. *Anderson v. Shalala*, 51 F.3d 777, 780 (8th Cir. 1995). However, in cases where such behavior has been upheld as a valid factor to discredit claimant testimony, there is generally a clear pattern of such behavior documented in the medical records over a period of time, often by more than one treating physician. See e.g. *Slater v. Barnhart*, 372 F.3d 956, 956 (8th Cir. 2004) ( "the record is filled with evidence of drug abuse, alcohol abuse, and drug-seeking behavior, including lying and manipulating others to obtain prescription drugs, self-medicating and failing to follow recommended treatments, drinking six bottles of beer and a bottle of wine daily, and overdosing."); *Anderson v. Barnhart*, 344 F.3d at 815 (treating psychologist noted "[t]here is a significant possibility of past/present problems with substance abuse ... and Anderson's extensive present use of (prescribed) pain medications." ); *Anderson v. Shalala*, 51 F.3d at 779 (over a one-year period claimant received so many injections of steroids and pain killers that "her physicians noted that she displayed drug-seeking behavior and has a possible substance abuse problem."). Aside from the one instance with Dr. Medina and the two ER visits to Summit, there is no evidence to suggest that the Plaintiff was drug seeking.

In addition to the medical evidence and statements from the treating physicians, the ALJ considered statements from the examining and consulting physicians. On August 21, 2012, Dr.

Robert Redd, a state agency medical examiner, examined the records and determined Plaintiff had a 20-pound weight limit with postural limits. (T. 434) Specifically, Dr. Redd found Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl. (T. 430) Dr. Redd further found, Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. (T. 431-432)

Dr. Ted Honghiran, board certified Orthopedic Surgeon and consultative examiner, examined Plaintiff on October 21, 2013. During this examination, Dr. Honghiran observed the Plaintiff walk with a slight limp on his left leg and he used a cane to walk in his left hand. He was able to get on his tiptoes and heels, but not for any distance. Plaintiff was able to dress and undress himself without difficulty and get on and off the examination table without help. Upon examination of his lumbar spine, Dr. Honghiran opined, Plaintiff could flex about 60 degrees and bend side to side about 5 degrees on both sides. There was no significant muscle spasms. With regard to straight leg raises, they caused pain in his legs on both sides at about 60 degrees. X-rays of Plaintiff's femurs, knees, tibias and fibulas were all normal.

Dr. Honghiran's impressions of the Plaintiff included, having a history of chronic low back and bilateral leg pain, namely on the left more than the right, with a tingling sensation, which is most likely caused by a herniated disc of the lower lumbar spine. Dr. Honghiran believed the Plaintiff's leg problem was a herniated disc of the lower lumbar spine, rather than restless leg syndrome. He believed the Plaintiff's prognosis was poor. Because of the Plaintiff's chronic back and leg pain, COPD, hypertension and depression, he did not believe Plaintiff would be able to work. Due to Plaintiff's only having an eighth grade education, the only job he would be able to perform was manual labor. He believed Plaintiff needed to be seen by a neurosurgeon. (T. 504-506)

In his Decision, the ALJ stated he based his Decision, partly on medical evidence, yet, he failed to obtain a neurosurgeon consultation after Dr. Honghiran stated Plaintiff's prognosis was poor, he might not be able to work and he needed to see a neurosurgeon to see if surgery was possible. The ALJ gave Dr. Honghiran's opinion little weight, as the he determined it was more limited than the objective medical evidence in the record.  However, from the Courts review of the record Dr. Honghiran was not the first doctor to mention neurosurgery.  In fact, Dr. Medina, who the ALJ did not even mention in his decision, recommended the Plaintiff see a neurosurgeon after receiving the results of an MRI, which showed bilateral neuroforaminal narrowing at L5-S1 and overt compression of the exiting left nerve root at L5.  There was possible compression of the nerve root on the right.  Dr. Medina noted Plaintiff had a "legitimate reason to complain of pain." (T. 399) Plaintiff was concerned about how he would pay for the surgery, as he was unemployed at the time.

Furthermore, while the ALJ stated PA Pearson recommended oral steroids or ESI, the ALJ failed to mention PA Pearson also informed the Plaintiff those were only temporary fixes and the Plaintiff may have to consider surgery in the future.  With regard to Dr. Puen's records, while they are not as detailed as the other records, they do show the Plaintiff again indicating he did not have the money for surgery.  The record reflected three doctors and one PA, who specialized in neurosurgery, discussing the possibility of neurosurgery, yet the ALJ did not seek a neurological consult for the Plaintiff.  In the Court's opinion, there was not sufficient evidence for the ALJ to make an informed decision as the ALJ should have ordered a neurological consultation. *See Gasaway v. Apfel*, 187 F.3d 840, 842 (8th Cir. 1999); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) ("[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." (citation and internal quotes

omitted)). The undersigned finds that remand is necessary to allow the ALJ to further develop the record.

On remand, the ALJ is directed to order a consultative neurosurgical examination complete with an RFC assessment to determine the Plaintiff's limitations and restrictions, whether or not the Plaintiff is a surgical candidate, and if his function would improve with surgery. If the neurosurgeon indicates the Plaintiff has a chronic condition and surgery is not an option, then direct the neurosurgeon to complete an RFC assessment detailing any restrictions placed on the Plaintiff as a result of his impairments.

### IV.    Conclusion:

Based on the foregoing, we recommend reversing the decision of the ALJ and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 13th day of March, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE